ORIGINAL

Approved: _____
JESSICA A. MASELLA / EDWARD Y. KIM
Assistant United States Attorneys

Before: HONORABLE JAMES C. FRANCIS IV
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :    **SEALED COMPLAINT**
                                 :
         - v. -                  :    Violation of
                                 :    18 U.S.C. § 371
ZACHARY ZWERKO,                  :
                                 :    COUNTY OF OFFENSE:
         Defendant.              :    New York
                                 :
- - - - - - - - - - - - - - - - - x

**14 MAG 2259**

DOC # ___1___

SOUTHERN DISTRICT OF NEW YORK, ss.:

JONATHAN LUCA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE
(Conspiracy to Commit Securities Fraud)

1. From in or about 2012 up to and including the present, in the Southern District of New York and elsewhere, ZACHARY ZWERKO, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17 Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

2. It was a part and object of the conspiracy that ZACHARY ZWERKO, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2 by: (a) employing

devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon the purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Overt Acts

3. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. In or about May 2014, ZACHARY ZWERKO, the defendant, acquired material non-public information relating to a potential acquisition of Idenix Pharmaceuticals, Inc. by the pharmaceutical company (the "Pharma Company"), where he was employed at the time.

    b. On or about May 20, 2014, ZWERKO called a co-conspirator not charged as a defendant herein ("CC-1").

    c. Approximately two minutes after the call concluded, CC-1 attempted to purchase shares of Idenix Pharmaceuticals, Inc., which order was ultimately not executed. Beginning on the following day and continuing until June 6, 2014, CC-1 purchased shares of Idenix Pharmaceuticals, Inc. Numerous trades were executed by CC-1 from CC-1's office in Manhattan.

    d. On or about June 9, 2014, the Pharma Company publicly announced its agreement to acquire Idenix Phamaceuticals, Inc., after which CC-1 began selling CC-1's shares of Idenix Pharmaceuticals, Inc., for a total profit of approximately $579,000.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I have been a Special Agent with the FBI for approximately three and a half years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses. I have

2

participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

5.  The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, including trading records, bank records, telephone records, records of electronic communications, and Internet Protocol ("IP") address logs, provided by various entities; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other FBI agents; (e) conversations with representatives from the United States Securities and Exchange Commission ("SEC"); (f) documents provided by employees of the Pharma Company, which operates in New Jersey; and (g) documents provided by employees of a bank operating in New York, New York (the "Bank"). Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Relevant Entities

6.  At all times relevant to this Complaint, Ardea Biosciences, Inc. ("RDEA"), was a biotechnology company headquartered in San Diego, California. On April 23, 2012, AstraZeneca, a pharmaceutical company, publicly announced the acquisition of RDEA.

7.  At all times relevant to this Complaint, ViroPharma Incorporated ("VPHM"), was a pharmaceutical company headquartered in Exton, Pennsylvania. On November 11, 2013, Shire PLC, a pharmaceutical company, publicly announced the acquisition of VPHM.

8.  At all times relevant to this Complaint, Idenix Pharmaceuticals, Inc. ("IDIX"), was a biopharmaceutical company headquartered in Cambridge, Massachusetts. On June 9, 2014, the Pharma Company publicly announced the acquisition of IDIX.

### The Defendant and His Employment at the Pharma Company

9.  Based on a review of public records and a review of employment records for ZACHARY ZWERKO, the defendant, I have learned that from approximately 2010 to July 2014, ZWERKO was employed at the Pharma Company, most recently as a Senior Finance Analyst in the Financial Evaluation and Analysis Group of the Pharma Company. In that role, ZWERKO performed work in connection with numerous potential and actual corporate transactions, including acquisitions.

10. Based on a review of public records and a review of employment records for CC-1, I have learned that from approximately 2009 to October 2014, CC-1 was employed at the Bank.

11. Based on my review of records supplied by the Pharma Company, I have learned that:

    a.  The Pharma Company's Conditions of Employment stated in part that "I will not, during or at any time after the period of my employment by the [Pharma] Company, use for myself or others or divulge or convey to others any confidential information, knowledge, data or property relating to the Company's business, developed, learned or in any way obtained by me during the course of my employment other than published material properly in the public domain, unless authorized by the Company in writing or by established Company procedures." On June 14, 2010, ZACHARY ZWERKO, the defendant, signed a document indicating that he understood and agreed to abide by the Pharma Company's Conditions of Employment.

    b.  The Pharma Company's written Corporate Policy governed, among other things, securities transactions by employees of the Pharma Company. The Corporate Policy provides that "Inside information . . . includes material, non-public information about another company that an employee may learn while acting on behalf of his or her employer in a transaction with such other company. Any [Pharma Company] employee who, while acting on behalf of [the Pharma Company] in a transaction with another company, obtains inside information concerning such other company, must maintain the confidentiality of the

4

information and refrain from trading in the securities of that company until that information has been made public."

   c. The Pharma Company's Code of Conduct provided that "[w]e are also prohibited from disclosing nonpublic material information to others – both inside and outside the Company – without a legitimate business reason and proper management authorization." The Code of Conduct also stated that "[m]aterial ('inside') information is any information that a reasonable investor would consider important in making investment decisions. Examples may include knowledge about acquisitions. . . . These same restrictions apply to nonpublic material information about other companies that we learn through our capacity as employees." On September 9, 2011, ZWERKO completed a training course entitled, "Know The Code." On August 12, 2013, ZWERKO completed a training course entitled, "The Code of Conduct Annual Refresher – English 2013."

### Summary of the Insider Trading Scheme

  12. As set forth below, there is probable cause to believe that ZACHARY ZWERKO, the defendant, used material, non-public information that he acquired as part of his employment at the Pharma Company and caused to be made profitable securities trades in brokerage accounts controlled by CC-1. Specifically:

   a. ZWERKO and CC-1 attended Rutgers Business School during the same time period and both graduated from Rutgers Business School in 2010. Since 2010, ZWERKO and CC-1 have maintained a social relationship, which includes telephone communications, e-mail correspondence, and social gatherings.

   b. As an employee of the Financial Evaluation and Analysis Group of the Pharma Company, ZWERKO had access to a computer directory maintained by the Pharma Company which contained material, non-public information related to potential acquisitions by the Pharma Company.

   c. In violation of the Pharma Company's policies and in breach of his duties to the Pharma Company, ZWERKO on multiple occasions passed to CC-1 material, non-public information related to future acquisitions by the Pharma Company, including the identities of the companies who were to be acquired (the "Target Companies"). CC-1 then traded in the securities of the Target Companies. The Target Companies were subsequently acquired, in one instance by the Pharma Company, and the prices of the shares of the Target Companies increased after the acquisitions were announced publicly. CC-1 then

exited CC-1's positions in the shares of the Target Companies, thereby profiting from the movement in stock price. From this illegal trading, CC-1 earned profits of at least approximately $722,000.

### CC-1's Brokerage Account

13. Based on my review of documents maintained by a brokerage firm ("Brokerage Firm-A"), I have learned the following:

    a. On or about March 27, 2006, CC-1 submitted an application to open a securities trading account at Brokerage Firm-A. Brokerage Firm-A approved the opening of the account, and CC-1 has maintained a securities trading account at Brokerage Firm-A (the "CC-1 Brokerage Account") from approximately March 2006 to the present.

    b. The account opening documents for the CC-1 Brokerage Account indicate that the account is an individual account and that CC-1 is the primary owner of the CC-1 Brokerage Account.

### The Insider Trading in RDEA Stock

14. Based on interviews and a review of public records, employment records, trading records of the CC-1 Brokerage Account, telephone and IP log records, and email communications to and from ZACHARY ZWERKO, the defendant, and CC-1 at their Pharma Company and Bank email addresses, respectively, I have learned that:

    a. On or about February 17, 2012, Merrill Lynch contacted multiple companies, including the Pharma Company, to gauge interest in a potential acquisition of Merrill Lynch's client, RDEA.

    b. In 2012, as part of his employment at the Pharma Company, ZWERKO performed work relating to a potential acquisition of RDEA. In connection with this work, individuals at the Pharma Company, including ZWERKO, had access to material non-public information ("MNPI") relating to the potential acquisition of RDEA.

    c. A cell phone was subscribed to ZWERKO during the relevant time period (the "Zwerko Phone"). A separate cell

6

phone was subscribed to CC-1 during the relevant time period (the "CC-1 Phone").

    d. On February 27, 2012, at approximately 5:13 p.m., the Zwerko Phone called the CC-1 Phone and engaged in a call lasting approximately six minutes.

    e. On February 28, 2012, CC-1 began purchasing shares of RDEA, at an initial price of $20.95 per share. Prior to this date, CC-1 had never purchased shares of RDEA. CC-1 continued purchasing shares of RDEA until April 18, 2012, ultimately purchasing approximately 9,800 shares. On April 23, 2012, AstraZeneca publicly announced that it would acquire RDEA for $32 per share. CC-1 subsequently sold CC-1's RDEA shares, for a profit of approximately $105,000.

### The Insider Trading in VPHM Stock

  15. Based on interviews and a review of public records, employment records, trading records of the CC-1 Brokerage Account, telephone and IP log records, and email communications to and from ZACHARY ZWERKO, the defendant, and CC-1 at their Pharma Company and Bank email addresses, respectively, I have learned that:

    a. Beginning on approximately September 13, 2013, a number of articles began reporting speculation that VPHM was for sale.

    b. In 2013, in the course of his employment at the Pharma Company, ZWERKO performed work relating to a potential acquisition of VPHM. In connection with this work, individuals at the Pharma Company, including ZWERKO, had access to MNPI relating to the potential acquisition of VPHM.

    c. On September 25, 2013, beginning at approximately 6:10 p.m., the Zwerko Phone made two consecutive calls to the CC-1 Phone for calls totaling approximately nine minutes.

    d. On September 26, 2013, CC-1 began purchasing shares of VPHM, at an initial price of $38.50 per share. Prior to this date, CC-1 had never purchased shares of VPHM. CC-1 continued purchasing shares of VPHM until October 28, 2013, ultimately purchasing approximately 3,200 shares. On November 11, 2013, a public announcement was made that Shire PLC, a pharmaceutical company, had agreed to acquire VPHM for $50 per

share. CC-1 subsequently sold CC-1's VPHM shares, beginning on December 9, 2013, for a profit of approximately $38,000.

### The Insider Trading In IDIX Stock

16. Based on interviews and a review of public records, employment records, trading records of the CC-1 Brokerage Account, telephone and IP log records, and email communications to and from ZACHARY ZWERKO, the defendant, and CC-1 at their Pharma Company and Bank email addresses, respectively, I have learned that:

    a. During early 2014, individuals at the Pharma Company performed work relating to a potential acquisition of IDIX by the Pharma Company. The Pharma Company ultimately acquired IDIX, which acquisition was publicly announced on June 9, 2014. Records provided by the Pharma Company show that ZWERKO was not assigned to work on the IDIX acquisition. However, other records indicate that beginning as early as May 5, 2014 ZWERKO began accessing documents pertaining to the IDIX acquisition.

    b. On May 20, 2014, at approximately 4:08 p.m., ZWERKO received an email from another Pharma Company employee at ZWERKO's Pharma Company email address. That email contained an earlier email chain which stated in part that the Pharma Company had submitted an initial non-binding proposal for acquisition of a company referred to under the codename "Project Invincible."[1] The email further stated that based on "initial CEO/banker feedback" it appeared that the Pharma Company's offer was sufficient to move into the due diligence stage of the acquisition process.

    c. Within ten minutes of receiving the email described above in paragraph (b), ZWERKO began conducting internet searches related to IDIX.

    d. On May 20, 2014, at approximately 5:38 p.m., the Zwerko Phone sent a text message to the CC-1 Phone.

    e. On May 20, 2014, beginning at approximately 8:12 p.m., ZWERKO accessed three files from the Project Invincible folder from his work computer.

---

[1] Project Invincible was used within the Pharma Company as the codename for the potential acquisition of IDIX by the Pharma Company.

8

f.  On May 20, 2014, at approximately 8:44 p.m., the Zwerko Phone called the CC-1 Phone and engaged in a call lasting approximately twelve minutes.

g.  Approximately two minutes after the call concluded, CC-1 attempted to purchase shares of IDIX at a limit price of $5 per share. This order was ultimately not executed. The following day, CC-1 began purchasing shares of IDIX at an initial price of approximately $6.32 per share. Prior to this date, CC-1 had never purchased shares of IDIX. CC-1 continued purchasing shares of IDIX until June 6, 2014, ultimately purchasing approximately 31,000 shares. Records, including IP logs, show that CC-1 executed a number of these trades from the Bank, which is located in Manhattan. On June 6, 2014, shares of IDIX closed at $7.23 per share.

h.  On June 9, 2014, prior to the opening of the market, a public announcement was made that the Pharma Company had agreed to acquire IDIX for $24.50 per share. On the date of this announcement, the share price of IDIX opened at $24.03 and closed at $23.79. CC-1 began selling IDIX shares the same day, at an initial price of approximately $23.99 per share, for a profit of approximately $579,000.

WHEREFORE, I respectfully request that an arrest warrant be issued for ZACHARY ZWERKO, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

JONATHAN LUCA
Special Agent
Federal Bureau of Investigation

Sworn to before me this
10th day of October 2014

HONORABLE JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK